## GUILD V. FIRST NATIONAL BANK OF DEADWOOD.

1. A territorial law in force in certain counties of the late Territory of Dakota, which provided that in those counties "it shall be lawful to take, receive, retain and contract for any rate [of interest] agreed on between the parties," allowed and fixed the rate of interest by law in such counties or district, within the meaning of Section 5197, Rev. St. U. S., which provides that "any association may take, receive, reserve and charge on any loan * * * interest allowed by the laws of the state, territory or district where the bank is located."

2. From February, 1881, when said territorial law was enacted, until July 1, 1887, when the same was repealed, it was lawful for territorial and private banks and individuals to take, receive, retain and contract for any rate of interest agreed on between the parties, within the counties named in the act, when there was an express contract in writing fixing the rate. Therefore, it was lawful for a national bank, in those counties, to contract in writing for any rate of interest agreed on between the parties.

3. Under the general law relating to interest in force in the territory after July 1, 1887, territorial and private banks and individuals were allowed to take, receive, retain and contract for interest at the rate of 12 per cent per annum, and national banks were therefore allowed to take, receive, and retain interest at the same rate; and it was not unlawful for such national banks, under the national banking act, to take, receive and retain interest paid at the rate of 12 per centum per annum, in the absence of an express contract in writing therefor.

4. A complaint that alleges that the defendant "knowingly and usuriously charged, took, received and reserved from plaintiff, and that plaintiff paid to defendant, for interest, * * * being at the rate of 24 per centum per annum," giving time, amount, etc., states facts sufficient to constitute a good cause of action for the recovery of such alleged illegal interest, under the national banking act.

5. Under Section 1851, Rev. St. U. S., one of the sections of the organic act of the Territory of Dakota, which provides "that the legislative power of the territory shall extend to all rightful subjects of legislation, not inconsistent with the constitution and laws of the United States," the territorial legislature was vested with general legislative power, restricted only as prescribed in the act, and subject to the power of congress to disapprove its acts.

6. The act of congress approved July 30, 1886, providing that "the legisla-

tures of the territories of the United States shall not pass special or local laws  *  *  *  regulating the interest on money," was not retro-active, but was applicable only to acts thereafter passed by a territo-rial legislature, and did not have the effect to invalidate the then ex-isting interest law in the counties mentioned in the provisions of the act of 1881.

7.  The passage of the law of 1881 by the territorial legislature, which pro-vided for a different rate of interest in certain counties of the territory from that allowed in other parts of the territory, was a valid exercise of the legislative power, and was not in conflict with the organic act or the constitution of the United States.

8.  A law changing the rate of interest which can lawfully be taken, by re-ducing such rate, does not affect express contracts in writing for inter-est at the higher rate, made when the law allowing the higher rate was in force, when such contract specifically provides that the interest, at the rate specified in the contract, shall be payable from the date of the contract until the same is paid.

(Syllabus by the court.   Opinion filed Jan. 24, 1894.)

Appeal from circuit court, Lawrence county.   Hon. CHAS. M. THOMAS, Judge.

Action by Alice M. Guild, administratrix of the estate of John Guild, deceased, against the First National Bank of Dead-wood, to recover illegal interest paid.   There was judgment for plaintiff, and defendant appeals.   Modified.

The facts are fully stated in the opinion.

*Moody & Washabaugh* and *Martin & Mason*, for appellant.

It was the intent and purpose of the national banking act to give national banks the right to charge and receive the same rate of interest as was allowed to be charged and received by natural persons, and by the laws of any state or district where such banks were situated, and to allow such national banks to charge a higher rate of interest than natural persons could charge if such higher rates was permitted to be charged by state or local banks.   Tiffany v. Bank, 18 Wall. 409; Natl. Bank v. Stover, 60 Cal. 387; Hinds v. Marmolejo, 60 Cal. 229; Bank v. Bruhn, 64 Tex. 571.

The intent and purpose of the act was to limit the rate of

interest to seven per cent only when there was no law of the state or district upon the subject of interest, in order that the rate might be provided for national banking institutions by law.

*Van Cise & Wilson* and *W. R. Steele*, for respondent.

The act of the legislature of the Territory of Dakota of February, 1881, relating to interest, did not fix a rate of interest in Lawrence county within the meaning of Section 5197 of the Revised Statutes of the United States.

No rate being fixed the defendant could only take or charge a rate of interest not exceeding seven per cent, and having illegally charged and taken a rate of interest exceeding seven per cent the party so paying may recover back double the whole amount of the interest paid. Hill v. Bank, 15 Fed. Rep. 432; Bank v. Johnson, 14 Otto 271; Bank v. Estate, 10 Natl. Bankruptcy Register 568; 11 Blatchford 243; Bank v. Gruber, 87 Penn. 468; Bank v. Dearing, 1 Otto 29; Bramhall v. Bank, 7 Vroom 243; Johnson v. Bank, 79 N. Y. 329; Crocker v. Bank, 4 Dillon 358.

Action for double the interest paid may be brought in the state as well as in the federal courts. Bletz v. Bank, 87 Pa. St. 37; Bank v. Childs, 130 Mass. 579; Bank v. Ballong, 45 N. W. Rep. 411; Bank v. Dearing, 1 Otto 29; Bank v. Alves, 15 S. W. Rep. 132; Bank v. Ballong, 45 N. W. Rep. 164.

The question whether a contract is usurious must be determined by the law in force at the time of its execution. Latrobe v. Hulbert, 6 Fed. Rev. 209; Root v. Pinney, 11 Wis. 89; Matthias v. Cook, 31 Ill. 86. If there be usury in the original transaction it effects all consecutive securities however remote, growing out of it. Campbell v. Sloan, 62 Pa. St. 481; Overholt v. Bank, 82 Pa. St. 493; Coke v. Bank, 86 Pa. St. 303; Bank v. Lewis, 75 N. Y. 518; Davis v. Gant, 55 Am. Dec. 397; Lynch v. Bank, 46 Am. Rep. 524; Bank v. Hoagland, 7 Fed. Rep. 159.

In the twenty causes of action numbered ten to twenty-nine inclusive, the charges and payments of interest were entirely

without written agreement, against decedent's monthly balances due to the bank on his overdrafts.    Upon these causes of action the exaction of interest was clearly usury under any view of the law.    Bank v. Miller, 90 Pa, St. 241.

The territorial legislation of 1881, exempting the Black Hills counties from certain parts of the law relating to interest on money and from the criminal penalties for usury was special and local legislation, and therefore invalid.    Bull v. Conroe, 13 Wis. 266; Durkee v. City, 28 Wis. 464; Heirs v. Kennedy, 24 Am. Dec. 113; Bank v. Coopet, 24 Am. Dec. 543; Budd v. State, 39 Am. Dec. 190.

CORSON, P. J.    This was an action originally commenced by John Guild, under the provisions of Section 5198, Rev. St. U. S., generally known as the "National Banking Law," to recover of the defendant, a national bank of the United States, organized under the national banking law, and doing business at the city of Deadwood, Lawrence county, in the now state of South Dakota, the amount of illegal interest alleged to have been charged and received by said defendant upon promissory notes, overdrafts, and monthly balances, in transactions between said plaintiff and said defendant, between April 30, 1886, and November 30, 1887.    The complaint contains 29 causes of action, to each of which the defendant interposed a separate demurrer.    The demurrers were all and severally overruled by the court, and leave given to answer over.    The defendant declining to answer, judgment was rendered in favor of the present plaintiff, who, upon the death of said John Guild, was substituted as plaintiff, for the sum of $4,338.29.    From this judgment the defendant has appealed.

The only question presented for our decision upon this appeal is, do the facts stated in the several causes of action constitute a cause of action, upon which plaintiff was entitled to recover?

The complaint may properly be divided into two parts. The first 9 causes of action are alleged to have arisen for illegal

interest taken upon promissory notes executed by plaintiff to the bank, in which the interest was agreed to be paid, in writing, and was specified in the notes.    In the last 20 causes of action the alleged illegal interest was charged and received by the bank on overdrafts, etc., without any agreement in writing for the payment of interest.    The eighth and ninth causes of action will be considered separately, for reasons which will hereinafter be stated.    The first paragraph of the complaint is as follows:    "That the defendant is now, and was before and during all the times hereinafter mentioned, a national banking association organized under the provisions of Title 62 of the Revised Statutes of the United States, and acts amendatory thereof, and actually engaged in the transaction of business as such in the city of Deadwood, Lawrence county, D. T., and that the plaintiff, during all the times hereinafter mentioned, was a customer of said defendant; having an open current account with the defendant in the course of business usual between banks and and their customers, comprising deposits made by plaintiff with defendant, checks drawn by or in the name of plaintiff upon defendant, and loans made by defendant to plaintiff, some of said loans being of moneys advanced directly to plaintiff, while others were in the form usually known and designated by and between banks and their customers as 'overdrafts,'—that is to say, amounts drawn by plaintiff from time to time, by checks or drafts upon defendant, in excess of the current balance to plaintiff's credit in his account with defendant,—which said checks and drafts, as the same were presented for payment, were paid by defendant, and charged to the account of plaintiff, the amount of such excess being loaned and advanced for the purpose by defendant to plaintiff.    That for some of the loans made by defendant to plaintiff, whether in the form of overdrafts or otherwise, the plaintiff, from time to time, executed and delivered to defendant his promissory notes, in writing, bearing interest as therein provided, and as hereinafter set forth in Paragraphs 2 to 10 inclusive, comprising the first

nine causes of action herein, while in other instances the indebtedness of plaintiff to defendant on account of said overdrafts remained in open account upon the books of defendant; and the defendant, from month to month, and at the expiration of each calendar month, computed and charged to plaintiff the interest upon such overdrafts for the preceding calendar month, as hereinafter particularly set forth in Paragraphs 11 to 24, inclusive, comprising the last nineteen causes of action herein. And the plaintiff prays that the foregoing allegations may be taken as, and he hereby makes them a part of, the allegations of facts constituting each of the several causes of action hereinafter stated, with like effect as if repeated in connection with each, respectively." We shall insert this paragraph of the complaint, only, as it fully explains the character of the transaction between the parties, and sufficiently shows the nature of the several causes of action, except that the rate of interest specified in the notes in the first seven causes of action was at the rate of 18 per cent per annum; in the eighth and ninth causes of action, 12 per cent per annum; and in the 20 remaining causes of action the interest alleged to have been charged and received was at the rate of 24 per cent per annum.

The learned counsel for the appellant contend that in the county of Lawrence, and in all the Black Hills counties, from February, 1881, to July, 1887, it was lawful for a national bank to charge and receive any rate of interest that might be agreed upon between itself and customers, and that after July 1, 1887, it was lawful for such bank to charge and receive 12 per cent per annum. The learned counsel for the respondent contend that the law in force in Lawrence county from 1881 to 1887 provided no rate of interest, but permitted parties to charge and receive such rate as they might agree on, and that a national bank doing business in that county was not permitted to charge more than at the rate of 7 per cent per annum. And they further insist that, since July 1, 1887, no rate of interest has been provided by law, and hence not more than 7 per cent could be charged and received by a national bank.

The section of the banking act applicable to this case is Section 5197, Rev. St. U. S., which reads as follows: "Any association may take, receive, reserve and charge on any.loan or discount made, or upon any note, bill of exchange or other evidence of debt, interest at the rate allowed by the laws of the state, territory or district where the bank is located, and no more, except that where by the laws of any state a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized or existing in any such state under this title. When no rate is fixed by the laws of the state, or territory, or district, the bank may take, receive, reserve or charge a rate not exceeding seven per centum and such interest may be taken in advance, reckoning the days from which the note, bill or other evidence has to run. And the purchase, discount or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount or sale; at rot more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest." In February, 1881, the legislature of the Territory of Dakota passed an act, being Chapter 31, Sess. Laws 1881, which reads as follows: "Section 1098 of Chapter three, Title four, Part four of Division third of the Civil Code, entitled, 'Loan of Money,' is hereby amended by adding to Paragraph one thereof the following: 'Except in the counties of Lawrence, Pennington, Custer, Mandan and Forsythe, wherein it shall be lawful to take, receive, retain and contract for any rate agreed on between the parties.' (2) Section 1100 of the same chapter is hereby repealed in the counties of Lawrence, Pennington, Custer, Mandan and Forsythe. (3) This act shall take effect and be enforced from and after its passage and approval." The effect of this act was to amend Section 1098 of the Code of 1887 as to the counties therein named, and the section as amended, reads as follows: "Sec. 1098. Highest Rate 12. The highest rate of interest which it shall be lawful for any person to take,

receive, retain, or contract for in this territory, shall be 12 per cent per annum, and at the same rate for a shorter time, (amended) except in the counties of Lawrence, Pennington, Custer, Mandan and Forsythe, wherein it shall be lawful to take, receive, retain and contract for any rate agreed on between the parties." In 1887 the act of 1881 was repealed, and the change in the law took effect July 1, 1887.

The first question presented is, what is the true construction of the terms "allow" and "fixed," as used in the section defining the rate of interest national banks may charge under the national banking act. It will be noticed that by the first clause of Section 5197 it is provided, "Any association may take * * * interest at the rate allowed by the laws of the state, territory or district where the bank is located," and that by the second clause it is provided that, "When no rate is fixed by the laws of the state or territory, or district, the bank may take, * * * a rate not exceeding seven per centum." And it will be further noticed that under the law as it existed in the Black Hills counties from 1881 to July, 1887, parties, including all corporaties and state banks, were allowed "to take, receive, retain and contract for any rate agreed upon between the parties." In construing the language used in the section under consideration, it will be well to notice the object and purpose of the national banking act. This is very clearly stated by Mr. Justice STRONG in Tiffany v. Bank, 18 Wall. 409, which was an action, like the present one, to recover alleged illegal interest taken by a national bank. The learned judge says: "It cannot be doubted, in view of the purpose of congress in providing for the organization of national banking associations, that it was intended to give them a firm footing in the different states where they might be located. It was expected they would come into competition with the state banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this, they were empowered to receive interest at the same rates, whatever those rates might

be, which were allowed to similar state institutions." Further on in the opinion the learned judge says: "National banks have been national favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in fact to create a market for the loans of the general government. It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the states, or to ruinous competition with state banks." With this view of the purpose of the national congress in establishing the national banking system, it must have been its purpose and intention to allow national banks to charge and receive as high a rate of interest as the state banks or private banks were allowed to take and receive. It will not be questioned, we apprehend, that under the territorial law, as amended, territorial or private banks were allowed as well as individuals and corporations, "to take, receive, retain and contract for any rate agreed on between the parties." This being so, national banks were, under that clause, allowed to take and receive any rate of interest agreed on between them and their customers. But it is contended that the term "fixed" is more restrictive, and many definitions were furnished by the counsel for the respondent to sustain this view; and they contend no rate is fixed, when parties are permitted to charge any rate "agreed on." But it seems to us the term "fixed," as used in the section, must be construed as substantially a repetition of the term "allowed." It would certainly be an unwarranted construction to hold that congress, in one clause, intended to give national banks all the advantages of state and private banks, and in the next clause to virtually deprive them of such advantages. The term "fixed," as used in that section, evidently means "provided by law," "allowed by law," "settled or established by law;" and the term "allowed," in the first clause, and the term "fixed" in the second clause, were used in the national banking act in substantially the same sense. This seems to be the view taken by the supreme court of California.

In Hinds v. Marmolego, 60 Cal. 229, that court says: "Read-ing the entire section, and considering the two clauses together, as they must be considered, we are of the opinion that the word 'fixed,' used in the last clause, is used in the same sense as the word 'allowed,' in the first clause, and that by the words, 'the laws of the state or territory,' is meant statute laws.   In other words, that the true interpretation of the act of congress is that in those states and territories having no statute upon the sub-ject of interest the national banks are allowed a rate not ex-ceeding seven per centum, while in those states and territories having a statute upon the subject they are authorized to charge and receive interest at the rate allowed other banks and indi-viduals.   From this view it follows that inasmuch as we have in California a statute (Civil Code, § 1918) providing 'that par-ties may agree, in writing, for the payment of any rate of in-terest, and it shall be allowed according to the terms of the agreement until the entry of judgment,' the national banks are also allowed to charge and receive such rates of interest as may be agreed on.   We do not find any of the authorities cited by either of the parties to this controversy directly in point, but think the views here expressed find support in the case of Tif-fany v. Bank, 18 Wall. 409, and are not in conflict with the de-cision in Johnson v. Bank, 74 N. Y. 329." The same view of the section of the banking act under consideration was taken by the supreme court of Texas in Bank v. Bruhn, 64 Tex. 571. In that case the court says: "The important question in this case arises upon the defense of usury, pleaded in bar of a por-tion of the plaintiff's demand.   That question is, could a na-tional bank located in Texas contract to receive two per cent per month interest on a note executed March 26, 1874?  Under our constitution and statutes then in force, eight per centum per annum was to be taken, recovered, and allowed, when the rate of interest was not specified, (Pasch. Dig. Art. 3940;) but parties might contract for any rate of interest upon which they might agree, all usury laws having been abolished by the con-

stitution of 1869, (Art. 12, § 44.") And the court concludes its able opinion as follows: "To hold that no more than seven per cent could be charged upon the note is to say that, at the time it was executed, we had no law in Texas regulating the subject of interest, and providing for its allowance, upon contracts of this character, which was not the case. In short, can it be said that a national bank is permitted to contract for interest at a rate allowed by the law of a state, when it charge two per cent, though that rate is authorized by such laws? We think these banks are on a footing with other banks, and that they may contract for the highest rate fixed or allowed by the statutes of the state, and that this is the meaning of the thirtieth section of the national banking act. This same question was decided by the supreme court of California in accordance with the conclusions of this opinion. Hinds v. Marmolego, 60 Cal. 229. We think the district judge erred in charging the jury that the note sued on was tainted with usury, and for this error the judgment must be reversed, and the cause remanded." We have quoted quite largely from those opinions, as they are directly in point,—the laws of both states upon the subject of interest being almost identical with the law in force in the Black Hills counties from 1881 to July 1877,—and also because of the learning and ability of those courts. And this seems to have been the view of the United States district court of Mississippi, in deciding the recent case of Timberlake v. Bank, 43 Fed. 231. The court, in that case, says: "The national bank law is a law unto itself, which congress had the power to enact, and, in express terms, it allowed the banks organized and doing business under its provisions to take and receive the highest rate of interest allowed by the state in which they are located and doing business. The rate of interest allowed by the law of this state is 6 per cent per annum, but 10 per cent per annum may be contracted for in writing. * * * Congress, in the act, did not adopt the state law upon the question of usury, further than to adopt the rate of interest allowed by the law of the state; and

10 per cent per annum is the highest rate of interest allowed by the statute of this state when the contract is made in writing, and 6 per cent when it is not." See Wiley v. Starbuck, 44 Ind. 298; Newell v. Bai k, 12 Bush. 57.

The authority mainly relied on by counsel for respondent, in support of their contention, is the case of Johnson v. Bank, 74 N. Y. 329, and the same case taken by writ of error to the supreme court of the United States, and reported under the title of Bank v. Johnson, 104 U. S. 271. We have given these two decisions very careful consideration, but we are unable to discover their applicability to the case at bar. It seems to us that the question presented in that case for decision was an entirely different one from the one presented in the case at bar. The highest rate of interest established by law in New York was 7 per centum per annum, and no provision was made by law for taking any higher rate, by agreement of parties or otherwise. The interest was absolutely fixed and limited by law to a rate not exceeding 7 per cent. A national bank in that state took and received interest at the rate of 12 per cent, but claimed it was taken not as interest, but as discount on the purchase of business paper. The court of appeals of New York, and the supreme court of the United States, held that, under the national banking act, discounting paper was one of its forms of loaning money, and, the rate of such loans being limited by the laws of the state of New York, the bank could not take interest in excess of that limit. Therefore, the taking by the bank of 12 per cent was unlawful. The supreme court of California, as will be noticed, does not regard the Johnson case, as decided by the court of appeals of New York, as in conflict with its decisions; and the supreme court of Texas, in the case cited, makes no mention of that case, or the decision in the same case on writ of error in the supreme court of the United States, although that decision was made a number of years prior to the Texas decision. Therefore, if these decisions in the Johnson

case support the views of respondent, it is somewhat remarkable that that fact was not discovered by either of those courts. We are of the opinion, therefore, that the law providing that "it shall be lawful to take, receive, retain and contract for any rate [of interest] agreed on between the parties," does allow and fix the rate of interest within the district, within the meaning of the banking act, and that the defendant bank was authorized to contract for and receive any rate of interest agreed on between it and the plaintiff's intestate in Lawrence county, that being one of those counties specified in the territorial act of 1881. Those seven causes of action are all based upon promissory notes, in which the rate of interest was agreed on, and specified to be paid, in writing; and all the causes of action are alleged to have occurred prior to July 1, 1887, when the territorial law of 1881 was repealed. This being so, it follows that the demurrer to the first seven causes of action should have been sustained.

In the eighth and ninth causes of action the interest alleged to have been paid was paid on a promissory note, subsequent to July 1, 1887, at the rate of 12 per cent per annum, though it was agreed on and specified in the note executed prior to July 1, 1887, to be at the rate of 18 per cent per annum. It is alleged in these two causes of action that the promissory note on which interest at the rate of 12 per cent per annum was taken, received, reserved, and retained by the defendant was executed on the 21st day of July, 1886, and was given for the sum of $7,000, "with interest at the rate of one and one-half per cent per month from the date thereof until paid." This note, and the express contract in writing for the payment of the interest at the rate specified, were legal and valid when made; and the repeal of the law under which they were made did not affect the validity of the note, or the contract for the interest at the rate specified, or render the note or the contract for the payment of interest at the rate specified invalid. A law changing the rate of interest which can lawfully be taken

by reducing the rate, does not effect express contracts in writing for interest at the higher rate, made while the law allowing the higher rate was in force, when such contract specifically provides that the interest at the rate specified in the contract shall be payable from the date of the contract until the same is paid. This doctrine seems to be well settled. In Taylor v. Wing, 84 N. Y. 471, the court of appeals of New York says: "In each of plaintiff's mortgages it was expressly stipulated that the principal sum should bear interest at the rate of seven per cent until it was paid. It is admitted that there was no error, notwithstanding the statute subsequently passed, reducing the rate of interest to six per cent, in allowing the plaintiff's interest at seven per cent, as stipulated, until the date of the decision of the case." 11 Am. & Eng. Enc. Law, p. 413. Such being the law, it was not unlawful for the defendant to take, receive, reserve and retain interest on the note set out in the pleadings at the rate of 12 per cent per annum; and, indeed, the defendant could have lawfully taken and retain interest at the rate of 1½ per cent per month, and in an action on the note could have recovered at that rate, notwithstanding the repeal of the law of 1881. But we are of the opinion, also, that, under the territorial statute after the repeal of the law of 1881, territorial and private banks and individuals were allowed to take, receive, retain and contract for interest at the rate of 12 per cent per annum, and that national banks, therefore, could lawfully receive and retain interest paid at the rate of 12 per cent per annum, in the absence of an express contract in writing fixing the rate of interest. Section 3723, Comp. Laws, provides that "a person taking, receiving, retaining or contracting for a higher rate of interest than the rate of 12 per cent person annum shall forfeit the interest * * *. When a greater rate of interest has been paid than 12 per cent per annum the perpaying it, * * * may recover the excess from the person taking it." It will be seen that by this statute it is only the taking, receiving, and retaining interest at a rate in excess of

12 per cent that is rendered illegal, under the statute. A rate greater than seven per cent may not be recoverable in an action, unless there is an express contract in writing fixing the rate; but a party may legally receive and retain interest that has been paid at the rate of 12 per cent, and no part of it can be recovered back. A state bank was therefore allowed to take, receive, and retain interest paid at the rate of 12 per cent under the laws of the territory, without any express contract in writing. The interest, therefore, taken and received by the defendant at the rate of 12 per cent, as alleged in the eighth and ninth causes of action, was legally taken and received, and there is no liability on the part of the bank to refund it. The demurrer to these two causes of action must therefore be sustained.

This brings us to the consideration of the last 20 causes of action. It is alleged in these causes of action—which are all alike, except as to amount—that "the defendant knowingly and usuriously charged, took, received and reserved from plaintiff, and plaintiff paid to defendant, for interest, * * * being at the rate of 24 per cent per annum. These allegations are to be taken in connection with the last clause of the first paragraph of the complaint, hereinbefore inserted, in which it is alleged that these charges for interest were made monthly, and paid upon balances and overdrafts for the preceding month. It is not specifically alleged in these causes of action that there was no contract in writing as to the rate to be charged, but as it was not lawful to take a higher rate of interest than 12 per cent, when no rate was agreed on in writing under the act of 1881 as amended, and it is alleged that the defendant usuriously charged, took and received interest at the rate of 24 per cent per annum, which is admitted by the demurrer, we think the complaint, as to these 20 causes of action, is sufficient. If the rate was agreed on, and was evidenced by an express written contract, that would be a matter of defense. It appears, therefore, that the rate of interest charged and received was in ex-

cess of the legal rate. The alleged illegal interest taken in the causes of action set forth in Paragraphs 11 to 25 inclusive, was taken while the territorial law of 1881 was in force, and those of 26 to 30 inclusive, after its repeal. As to these latter causes of action, the interest at the rate of 24 per cent per annum could not have been legally received and retained, even under an express written contract; and hence, as to these, the demurrers, in any view of the case, were properly overruled. We are therefore of the opinion that the demurrer to the last 20 causes of action, embraced in Paragraphs 11 to 30 inclusive, were properly overruled.

The learned counsel for the respondent contend that the law of 1881, made for certain counties alone, was in contravention of the organic act, and was therefore void. The only sections of the organic act, called to our attention, with which the law in controversy is claimed to be in conflict, are Section 1851, Rev. St. U. S., Section 12 of the Organic Act, and the act of congress approved July 30, 1886. Section 1851 provides "that the legislative power of the territory shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States," and the act of congress provides that "the legislature of the territories of the United States shall not pass special or local laws in any of the following enumerated cases, that is to say:  *  *  *  regulating the rate of interest on money;" and the act concludes "that all acts and parts of acts hereafter passed by any territorial legislature in conflict with the provisions of this act shall be null and void." The grant of power to territorial legislatures by the provisions of Section 1851 is broad and comprehensive, and was evidently intended to vest in territorial legislatures the powers ordinarily exercised by the legislatures of organized states, subject, however, to the disapproval of congress. The acts of a territorial legislature, therefore, not in conflict with the constitution or laws of the United States, or the organic act, are considered as valid and binding as the acts of legislatures of

organized states.    In Trustees for Vincennes University v.
State of Indiana, 14 How. 268, the supreme court of the United
State says:    "Under the ordinance the legislature of the terri-
tory was vested with general legislative powers, restricted only
by the articles contained in that instrument."    Miners Bank v.
Iowa, 12 How. 1; Clinton v. Englebrecht, 13 Wall. 446; Cooley
Const. Lim. p. 34.    Assuming, then, that a territorial legisla-
ture may lawfully enact any law that would be within the or-
dinary powers of a legislature of a fully organized state, not in
conflict with its state constitution, we are of the opinion that
the law in question was a valid exercise of the law making
power vested in the territorial legislature.    That a state legis-
lature, unrestrained by its constitution, has the power to enact
such a law, seems to be well settled.    Mr. COOLEY, in his work
on Constitutional Limitations, (5th Ed. pp. 482, 483,) says:
"Laws public in their objects may, unless express constitutional
provision forbids, be either general or local in their application.
They may embrace many subjects, or one, and they may ex-
tend to all citizens, or be confined to particular classes, as minors
or married women, bankers or traders, and the like.    The au-
thority that legislates for the state at large must determine
whether particular rules shall extend to the whole state and all
its citizens, or, on the other hand, to a subdivision of the state,
or a single class of its citizens, only.    *  *  *    These discrim-
inations are made constantly, and the fact that the laws are of
local or special operation, only, is not supposed to render them
obnoxious in principle.    *  *  *    If the laws be otherwise un-
objectionable, all that can be required, in these cases, is that
they be general in their application to the class or locality to
which they apply; and they are then public in character, and
of their propriety and policy the legislature must judge."    And
in a footnote, on page 482, the author says:    "To make a stat-
ute a public law of general obligation, it is not necessary that
it should be equally applicable to all parts of the state.    All
that is required is that it shall apply equally to all persons

within the territorial limits prescribed in the act. State v. County Comrs. of Baltimore, 29 Md. 516. See Pollock v. Mc-Clurken, 42 Ill. 370; Haskell v. Burlington, 30 Iowa 232; Unity v. Burrage, 103 U. S. 447. In Missouri v. Lewis, 101 U. S. 22, the supreme court of the United States, speaking by Mr. Justice BRADLEY, says: "Each state has the right to make political subdivisions of its territory for municipal purposes, and to regulate their local government. As respects the administration of justice, it may establish one system of courts for cities, and another for rural districts; one system for one portion of its territory, and another system for another portion. Convenience, if not necessity, often requires this to be done, and it would seriously interfere with the power of a state to regulate its internal affairs to deny it this right. We think it is not denied or taken away by anything in the constitution of the United States, including the amendments thereto. We might go still further and say, with undoubted truth, that there is nothing in the constitution to prevent any state from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the state of New York, for example, should see fit to adopt the civil law, and its method of procedure, for the city of New York and the surrounding counties, and the common law, and its method of procedure, for the rest of the state, there is nothing in the constitution of the United States to prevent it doing so. * * * If a Mexican state should be acquired by treaty and added to an adjoining state, or part of a state, in the United States, and the two should be erected into a new state, it cannot be doubted that such new state might allow the Mexican laws and judicature to continue unchanged in one portion, and the common law, and its corresponding judicature, in the other portion." The law in question did not, as we have seen, conflict with the constitution of the United States, (Missouri v. Lewis, *supra;*) and it did not conflict with any provision of the organic act then in force, and was not disapproved by congress, (Clinton v. Englebrecht,

*supra.*) The act of 1886, referred to, expressly applies to laws thereafter to be passed. Even assuming that it was intended to apply to a case like the one before us, by the last clause of the act it is provided "that all acts and parts of acts hereafter passed * * * in conflict with the provisions of that act shall be null and void." It thus clearly appears that it was not the intention of congress to render existing laws null and void.

Therefore, our conclusions are that the interest taken and retained by the defendnat upon the first nine causes of action was legally received and retained, and that no right exists on the part of the plaintiff to recover back any portion of the interest so paid and retained, and that, as to the causes of action set out in the last 20 causes of action, the interest received and retained was illegally taken and retained, and that the defendant is liable for the same. The judgment of the circuit court must therefore be modified by deducting therefrom all sums received for interest included in the first nine causes of action, and, when so modified, is affirmed. The cause is therefore remanded to the circuit court, with directions to modify the judgment as above indicated. As the judgment is modified each party will pay his own costs on this appeal.